Filed 9/25/23

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

|  |  |
|---|---|
| THE PEOPLE, | C095100 |
| Plaintiff and Respondent, | (Super. Ct. No. F20-000212) |
| v. | |
| WESLEY CARL PANIGHETTI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Nevada County, S. Robert Tice-Raskin, Judge.  Affirmed as modified.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Erin Doering, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Wesley Carl Panighetti and Jill Doe practiced bondage, discipline, sadism, and masochism (BDSM) together. When defendant went beyond the scope of Jill's consent, his conduct became criminal. A jury rejected the argument that, by virtue of a written agreement to consent to BDSM at all times, Jill had irrevocably agreed to allow defendant to dominate all aspects of her life. The jury found him guilty of multiple sex offenses, attempting to dissuade a witness, and residential burglary.

He challenges those convictions here, arguing that the trial court erred by: (1) denying his multiple requests for new counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*); (2) instructing the jury it could consider prior uncharged offenses involving Jill Doe; (3) inflicting cruel and unusual punishment in imposing a 280 year-to-life sentence; and (4) failing to calculate and award presentence custody credit. We modify the judgment to award presentence custody credit and otherwise affirm.

## LEGAL AND FACTUAL BACKGROUND

Given the nature of the claims on appeal, we need not undertake a detailed account of the facts of this case except as relevant to each issue below. We therefore summarize the facts as follows.

Defendant met Jill in 2000 and they began dating. After about a year, the relationship turned violent; defendant inflicted multiple injuries on Jill.

In 2001 or 2002, defendant was incarcerated and blamed Jill for it. Once released from prison, defendant went to Jill's home and forced her to perform a sex act. Days later, when Jill accused defendant of raping her, he responded, "I'll show you what rape is," and forcibly penetrated her vagina with his penis. Jill reported this incident to law enforcement. As a result of this incident, defendant was convicted of false imprisonment and sentenced to prison. Jill obtained a restraining order against defendant.

In 2006, Jill attempted to renew the restraining order but changed her mind. Instead, she opted to give defendant a second chance. Defendant immediately resumed

2

physically, sexually, and emotionally abusing Jill. Defendant drafted a "sexual agreement" (agreement) in which Jill agreed to be a submissive sex slave and "train to serve him." This document also specified that Jill agreed "to submit myself and all I have to the control of Wesley Carl Panighetti with out restriction. From now on my body and all I have and own will belong to Wesley Carl Panighetti to use as he wishes and to do with as he may please with out restriction."

Jill testified she did not understand what it meant to be "submissive," and she only signed the agreement because she was afraid of defendant. At defendant's insistence, Jill had the document notarized. Defendant and Jill each thought that because the document was notarized, there was no way to end the agreement. After additional violent encounters with defendant, including an incident where defendant forced Jill to endure unprotected anal sex while he had an active herpes outbreak, Jill showed the written agreement to an attorney who suggested she contact law enforcement.

Jill contacted the police and submitted to a medical examination. Jill was uncertain whether criminal charges resulted from her outcry. She testified that defendant violated conditions of his parole by seeing her and was subsequently incarcerated in a different county to serve the remainder of a previous sentence. Defendant was later paroled and required to live in Bakersfield until 2009. According to defendant, he moved to northern California in 2009 and saw Jill in 2009, 2012, and 2013. They lost contact until 2020.

In 2020, after not speaking for years, Jill reached out to defendant. At trial, Jill explained that at that time, the dosage of her bipolar disorder medication had been changed, resulting in impulsive behavior, and she was in an "altered state" when she contacted defendant. Defendant was still upset that Jill reported his prior behavior to law enforcement. Nevertheless, they engaged in consensual sex. As discussed below, future encounters with defendant turned violent.

3

During a sexual encounter in May 2020, defendant forcibly sodomized Jill three times in one day, despite her screams to stop, obvious injury, and profuse bleeding. The next day, he forced her to orally copulate him. Defendant repeatedly threatened to kill her or have her killed if she went to the police. He also told her that if he drank alcohol, he would kill her. At some point, defendant left the house. In an effort to avoid him, Jill left town for several days.

When Jill returned home, defendant came over uninvited. He demanded to stay at Jill's house for a week while he recuperated from a recent hospital stay. Jill became increasingly scared of defendant and when he demanded her property, she made efforts to comply. She gave him the deed to her house and when he demanded $8,000, she put that amount in cash in an envelope inside her dresser. Later that evening, defendant demanded that Jill orally copulate him and pushed her head toward his penis. She did not want to do it, in part, because he had a catheter in his penis. She told him so, but she felt forced to do it.

Two days later, defendant verbally and physically assaulted Jill. The couple then drove to a market where defendant bought alcohol and some cigarettes. Recalling defendant's repeated threats that he would kill her if he drank alcohol, Jill realized that she had to escape from him. When defendant stepped out of her car as they returned to her home, Jill drove directly to the home of her longtime psychotherapist. Jill told her psychotherapist that defendant was trying to kill her. They called the police.

Meanwhile, after Jill drove away, defendant broke into Jill's house and retrieved the $8,000. The break-in was witnessed by a neighbor, who happened to be a member of law enforcement. The neighbor saw defendant enter the house through a broken window and exit the house through the front door. He immediately called 911, and defendant was arrested shortly thereafter.

Defendant freely admitted to the investigating sheriff's deputy that he entered Jill's home while she was not there and took $8,000, which was subsequently found in

4

his car. He said the money belonged to him as it was compensation from Jill for having him arrested in the past. Defendant told the deputy about the "contract" he and Jill had "that gave him permission to force her to do anything that he wanted to." He also told the deputy about his fear of killing someone if he drank alcohol.

At trial, defendant both denied engaging in some of the alleged conduct, like specific instances of choking or slapping Jill, and explained his conduct was committed with Jill's consent and in accordance with their written agreement. He said Jill enjoyed "kinky sex" and sought to be "bound, whipped [and] forced to orgasm." He, himself, was innocent in the ways of bondage, but he quickly learned how to enjoy sexually dominating her. He also testified that Jill revealed she had been raped by another man and wanted defendant to sexually abuse her in that same manner.

Defendant admitted he dictated the terms of the written BDSM agreement, including language that stated he could use Jill's body to do with as he pleased "without restriction," but explained that he thought that was his best means of avoiding false accusations of sexual misconduct. Defendant believed the agreement gave him the absolute right to do the things he did to Jill. According to defendant, Jill verified the agreement was still in effect in 2020. Although he warned her that he would punish her if she made him angry, he testified that Jill renewed the relationship with "eyes wide open" so that when he did punish her, it was with her consent.

The prosecutor charged defendant with several offenses occurring in 2020: three counts of forcible sodomy, in violation of Penal Code section 286, subdivision (c)(2)(A)[1] (counts I-III); two counts of forcible oral copulation, in violation of section 287, subdivision (c)(2)(A) (counts IV-V); one count of criminal threats, in violation of section 422, subdivision (a) (count VI); one count of battery on a spouse, cohabitant, or person

---

[1]    Undesignated statutory references are to the Penal Code.

with whom he had a dating relationship, in violation of section 243, subdivision (e)(1) (count VII); one count of attempting to dissuade a victim or witness, in violation of section 136.1, subdivision (b)(1) (count VIII); and one count of first degree residential burglary, in violation of section 459 (count IX). It was further alleged that defendant had suffered two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and two prior serious felony convictions (§ 667, subd. (a)).

Following a jury trial, defendant was found guilty on all counts and the prior conviction allegations were found to be true.

On September 21, 2021, the trial court sentenced defendant to an aggregate state prison term of 280 years to life, consisting of consecutive 25-year-to-life "third strike" terms (§ 667, subd. (e)(2)(A)(ii)) on counts I, II, III, IV, V, VI, VIII, and IX, for a total indeterminate sentence of 200 years to life, and added two 5-year enhancements under section 667, subdivision (a) to each of those eight counts, for a total determinate term of 80 years. The trial court also imposed a concurrent 90-day county jail term on count VII, the misdemeanor battery count.

Defendant filed a timely notice of appeal.

## DISCUSSION

### I

### *Marsden Hearings*

Defendant contends the trial court abused its discretion in denying his *Marsden* motions. According to defendant, he and defense counsel were embroiled in an obvious irreconcilable conflict, which the trial court ignored, such that ineffective representation likely resulted.

#### A. Additional Factual Background

Defendant was initially appointed counsel, Micah Pierce, on June 17, 2020. Defendant submitted a *Marsden* request in June 2020; it was subsequently denied. However, defendant's second *Marsden* request was granted on July 28, 2020. Paul

6

Comiskey was appointed to represent defendant on August 7, 2020. Thereafter, defendant made seven *Marsden* requests, all of which were denied, and Comiskey continued to represent defendant throughout trial.

1. September 18, 2020, *Marsden* hearing

Defendant's first *Marsden* request against trial counsel was made on September 18, 2020. Defendant made various complaints, including that counsel had not filed a section 995 motion; that no witness subpoenas had been served; that trial counsel did not know what a "non-statutory motion to dismiss" was; and that the prosecutor had committed various errors. He complained that counsel was so overburdened by other duties that he had no time to prepare a motion pursuant to section 995 or to type up defendant's handwritten motion to dismiss.

In response to the allegations, trial counsel summarized his legal experience: he had been a criminal defense attorney since 1975, had done approximately 200 jury trials, and had worked on thousands of plea bargain cases; he also qualified as a criminal law specialist and had experience with three strikes and sex offense cases.

Trial counsel agreed he had yet to issue any subpoenas in the case as he was "not there yet." Since his assignment to defendant's case, he had received and reviewed approximately 300 pages of discovery; had participated in the preliminary hearing; requested an investigator; had met and spoke with the investigator, including giving him several assignments; had visited with defendant every Saturday; had been researching experts to retain for trial; had been working to obtain a transcript of a prior court proceeding between Jill and defendant per defendant's request; and had drafted motions in limine and oppositions to motions in limine. Counsel said he considered but rejected the idea of filing a motion pursuant to section 995 because the chances of success were very slender and it was not a strategic use of his time.

Trial counsel expressed the belief that defendant had an unrealistic idea as to how to get the case to "just go away." Counsel also expressed concern that any conflict with

defendant revolved around defendant's refusal to adhere to the idea that there was only "one boss in preparing for a trial." For example, defendant insisted that he write motions and that trial counsel type them and put his name on them despite the fact they did not agree on what should be included in the motions. Despite that conflict, counsel affirmed that he could continue to "zealously represent" defendant and give his best advice and counsel.

Defendant replied that he had "full confidence" in trial counsel representing him at trial but that he was upset that after the trial court granted his request under *Marsden* as to attorney Pierce, counsel needed additional time to prepare for trial. Defendant spent the remainder of his time complaining about the judicial process, Jill, the prosecutor, and other ancillary details of his case.

Ultimately, the trial court found there was not a breakdown in the relationship between defendant and trial counsel. Indeed, the trial court was not even persuaded that defendant was asking for substitution of counsel. However, to the extent that he was, the trial court denied the *Marsden* request.

2. November 2, 2020, *Marsden* hearing

Trial counsel declared a doubt that defendant could assist him in preparing a defense and requested an evaluation pursuant to section 1368.[2] Subsequently, defendant requested a *Marsden* hearing. Defendant raised a myriad of issues relating to: trial subpoenas regarding phone records, texts and notes from a separate prosecution; pretrial filings; and the prosecutor. Defendant had also taken offense to the fact that counsel declared a doubt as to defendant's competency.

Trial counsel again detailed his preparations for trial and his tactical decisions, explaining that some of the records did not correspond to defendant's account of events.

---

[2] Defendant was found to be competent.

8

He noted that he had an extensive set of important text messages from Jill's phone.  He also explained his reason for declaring a doubt as to defendant's competence, stating that he found it extremely difficult to talk to defendant because the dialogue was one-sided with a "constant flow of words" from defendant.

Counsel told the court about a recent visit with his investigator and defendant.  Defendant had "just almost what I consider to be kind of a complete emotional meltdown and because of the fact he—I'm concerned about his impulse control.  I am concerned about his anger, and I don't know how much of all of those things are related to mental illness, but I have, I think, a professional obligation, given the serious nature of this case, to either eliminate that possibility through a psychologist interviewing him—or I just don't feel comfortable just doing a trial if I have those concerns.  I think the Court observed that at the preliminary hearing.  [Defendant] simply couldn't control himself."  Counsel noted that defendant had been so disruptive at the preliminary hearing that counsel had difficulty doing his job and counsel was concerned that the same would happen at trial.

In response to counsel's statements, defendant continued to argue the lack of merit to the prosecution given certain details of his relationship with Jill.

The trial court found that counsel had properly represented defendant and that there had been no breakdown in the relationship.  The court continued, "I do believe that to the extent that there has been any deterioration in the relationship . . . if there is the distinct possibility that it might be related to some of the mental health issues that have been cited by Counsel and have raised concerns for Counsel, I am going to deny the *Marsden* motion at this time."

3. February 11, 2021, *Marsden* hearing

The parties took a break from jury selection to hold a third *Marsden* hearing.  Defendant asked that counsel be relieved because counsel "has the beginning of [early] onset Alzheimer's," and claimed that counsel appeared to have memory problems.  After

asking defendant to lower his voice, the court told defendant that it needed more specificity as to the reasons for the request. Defendant could not describe specific instances, but claimed that counsel would tell defendant that he would do something and then later say he did not remember committing to the action. Defendant admitted that he "exploded" at counsel the day prior because "this needs to be done." Defendant also admitted that "frustrations got to the level that [he] can't even communicate with [counsel]." He continued to complain about other various tasks that counsel either refused to do or forgot to complete, including combing through parole and prison files.

Trial counsel responded that he was in good health with no memory issues; in fact, he had a good memory. Counsel explained, however, that when defendant "comes on so strong," it turns into a "stressful event to try to talk to him sometimes and that affects my ability to understand exactly what he's talking about."

Counsel once again described his diligence on the case, his discovery that potential witnesses did not remember relevant facts, and his reasons for various tactical decisions. He explained it was difficult to explain to defendant "the downside of doing something" because defendant would shout at him, "Don't make excuses . . . Just do what I want you to do." He also explained that others had also commented about how badly defendant treated counsel.

The issue of defendant's competency came up again, and counsel explained that when defendant gets upset and stressed, "it would be kind of a wrath." The moment counsel would walk into the room to speak with defendant, defendant immediately began shouting at him. On one occasion, defendant shouted so loudly that a deputy had to come in to tell defendant that he was disrupting nearby video visits. After that episode, defendant commented that he had a headache from stress and yelling so loudly. Counsel apologized and left the meeting shaking. This exchange prompted counsel to declare a doubt as to defendant's competence because counsel did not believe that defendant could

assist in his own defense and wanted to investigate whether there was an underlying illness or simply a behavioral issue.

As a final point, counsel emphasized that he gave defendant every opportunity to communicate with him. Counsel visited defendant frequently in jail and provided defendant with his cell phone number; defendant called counsel frequently, even during dinner or late at night. Counsel always answered defendant's call unless counsel was in court. He admitted that there were communication problems—some were because defendant was incredibly demanding and did not listen and some were because counsel needed to be more assertive. Defendant constantly asked counsel to investigate past issues from years ago and counsel struggled with balancing those requests and the demands of the upcoming trial. Despite all of this, counsel agreed that he would continue to zealously represent defendant.

Before responding to the merits of his own *Marsden* motion, defendant commented he had to respond to the court's "attitude" that defendant was taking up so much of the court's time. Defendant then repeated his concerns with counsel's failure to contact the witnesses defendant insisted or thought were crucial, insisted the case should be dismissed because he was innocent, and complained that counsel disagreed with him that certain facts of his case were important. The trial court repeatedly tried to refocus defendant on the *Marsden* issues and repeatedly asked defendant to refrain from speaking over the court.

After defendant finished, the trial court found that trial counsel had properly represented defendant and the court had "every reason to believe that he will continue to do so." To the extent there was any barrier to communication between the parties, the court found that it was not due to any fault of counsel.

11

4. February 19, 2021, *Marsden* hearing

Defendant requested a fourth *Marsden* on February 19, 2021, in the middle of trial.[3] Defendant claimed that he had no confidence in counsel because counsel "is unable to relate what I say to the Court as I say it. Counsel represents what he wants to tell the Court, not what I want to tell the Court." Defendant claimed there was no legal reason for counsel to refuse to present defendant's words exactly as stated, unless counsel was trying to suppress what defendant was trying to say. Defendant asked to be "co-counsel" with counsel.

Counsel disagreed that he refused to take input from defendant and explained that he did incorporate defendant's suggestions where appropriate while questioning the witnesses. Counsel also pointed out that defendant was getting "very, very angry and very frustrated" during trial and that it was visible to the jury. Defendant had told counsel that he had no confidence in him. Defendant also wrote "Fuck you" to counsel on a piece of a paper in the middle of trial.

Defendant replied that he believed counsel was trying to sabotage the questions at trial because counsel would not say or ask exactly what defendant demanded. He also claimed that counsel did not understand the case. Despite these issues, defendant wanted to be co-counsel so he could ask his own questions at trial.

Citing to *People v. Lucky* (1988) 45 Cal.3d 259, 281, the trial court told defendant that he did not have a "right to an attorney who would conduct the defense of the case in accord with the whims of an indigent defendant." The trial court also stated that, under the law, disagreements over trial tactics do not warrant a substitution of counsel under *Marsden*. The court found there was evidence of numerous tactical disagreements between defendant and his attorney but there had not been a breakdown in the

---

[3]     Two days prior, the trial court denied defendant's request to represent himself under *Faretta v. California* (1975) 422 U.S. 806, as untimely.

12

relationship between defendant and counsel. The court further found that, to the extent there had been a deterioration of the relationship, it was caused—based on overwhelming evidence—by the "willful, recalcitrant and defiant attitude" of defendant. Finally, the court reminded defendant that it was not counsel's job to be a "servant and to follow the directions of his client." The trial court also denied defendant's request to be co-counsel because there had not been a substantial showing that this would "promote justice" or "judicial efficiency."

### 5. February 24, 2021, *Marsden* hearing

In his fifth *Marsden* hearing, defendant complained that he did not agree with counsel's approach to submitting only portions of jail phone calls instead of the entire recordings and transcripts. Defendant also believed that trial counsel was meeting with the prosecutor behind his back and intentionally suppressing evidence that would "help the jury understand [his] innocence." Defendant then explained various pieces of evidence he wanted admitted on his behalf.

Trial counsel admitted that he did not request the remainder of the jail calls to be admitted during the prosecutor's case-in-chief, but expected to include that evidence when defendant testified. Counsel also discussed the evidence defendant wanted admitted. Some evidence did not warrant extensive exploration because counsel did not want to "open any doors." He tried to explain this to defendant. Other evidence had admissibility problems.

The trial court once again found that counsel had effectively represented defendant and had no concerns about his representation during trial. The trial court also reminded defendant that counsel was "the captain of the ship and . . . make[s] all but a few fundamental decisions on behalf of the defense."

### 6. March 8, 2021, *Marsden* hearing

In his sixth *Marsden* hearing, defendant stated he had grave concerns about his representation as well as the conduct of the court and the prosecutor. Defendant was

upset that the court denied his proposed jury instructions that counsel submitted on his behalf.[4] He was also upset that counsel did not inform the jury about certain facts regarding Jill and their written agreement or how it was binding under contract law. Defendant also accused the prosecutor of lying, misrepresenting the facts, and committing fraud on the court during her closing argument but defense counsel did not object.

Trial counsel responded that he believed the court appropriately instructed the jury. Counsel also stated that he either did not hear anything objectionable during closing argument or decided for tactical reasons to refrain from objecting. Counsel stated that he did research the contract law issue and could not conclude the contract would have been valid. He also concluded that if he had requested pinpoint instructions on contract law principles, he believed the prosecutor would have requested other instructions that were not favorable to defendant. Rather, counsel opted to rely heavily on defendant's good faith belief that Jill freely entered into the agreement and thus consented to the nature of their sexual encounters. He pointed out that he tried to fully elicit that Jill told defendant in April that the "contract" was still valid to bolster the consent argument. Ultimately, counsel said he made the best tactical decisions that he could for this case.

The trial court, citing *People v. Smith* (2003) 30 Cal.4th 581, first noted that the *Marsden* motion was untimely because it was requested after the close of evidence and minutes before closing arguments and granting the motion would have required a mistrial, resulting in a delay of the proceedings. Aside from the untimeliness of the motion, the court also found that counsel had provided adequate assistance of counsel and that his actions appeared wholly consistent with the law or tactical decisions within his discretion. The court stated the critical legal issue in the case was not the enforceability

---

[4] A significant portion of this *Marsden* hearing concerned the propriety of the jury instructions offered and given.

of the contract; the issue was whether that contract and all of the other conduct amounted to consent or reasonable belief of consent, and the court found counsel provided effective representation in presenting that defense.

### 7. May 24, 2021, *Marsden* hearing

In defendant's final request for substitution of counsel, he complained that counsel did not file a reply to the prosecutor's opposition to the motion for new trial. Defendant argued the prosecutor made false statements in the opposition, to which counsel should have objected and brought forward the true facts highlighting defendant's innocence. Defendant similarly attacked the prosecutor for making false statements in her sentencing brief and at trial, and faulted his trial counsel for failing to correct those falsehoods.

Counsel admitted that he did not file a reply brief because he was working on other things for defendant and he forgot to do it. During this exchange, defendant interrupted the proceedings numerous times and defied court orders to remain quiet while others were speaking. The court called a recess, even though they had just returned from one. At the trial court's request, counsel addressed several lines of argument in the prosecutor's moving papers that defendant objected to, explained his tactical decisions in posttrial filings, and addressed the issue of the prosecutor's misconduct in closing argument.

Ultimately, the trial court found that counsel effectively represented defendant and denied the request to substitute counsel.

### B. *Analysis*

"A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (*People v. Jones* (2003) 29 Cal.4th 1229, 1244-1245.) "We review a trial court's decision declining to relieve appointed counsel under the deferential abuse of discretion standard." (*Id.* at p. 1245.) Denial of a motion pursuant to *Marsden* is " ' "not

15

an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel." ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 95.) We review a trial court's erroneous denial for prejudice under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24. (*Marsden, supra*, 2 Cal.3d at p. 126.)

" 'Tactical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict." ' " (*People v. Valdez, supra*, 32 Cal.4th at p. 95.) Nor does a defendant's "claimed lack of trust in, or inability to get along with, an appointed attorney" compel, without more, the discharge of appointed counsel. (*People v. Crandell* (1988) 46 Cal.3d 833, 860, abrogated on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) "If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." (*People v. Jones, supra*, 29 Cal.4th at p. 1246.)

We find no abuse of discretion. First, many of defendant's *Marsden* motions were untimely. " 'It is within the trial court's discretion to deny a motion to substitute made on the eve of trial where substitution would require a continuance.' [Citation.] This is even more true if the motion is made *during* trial." (*People v. Smith, supra*, 30 Cal.4th at p. 607.) Here, the majority of defendant's motions were made on the eve of, or during, trial. Defendant's third *Marsden* motion was brought during motions in limine and after the commencement of voir dire. His fourth motion was filed after voir dire was conducted. His fifth motion was made during the prosecutor's case-in-chief. His sixth motion was made during jury deliberations. To grant defendant's motion " 'would have required either a significant delay or a mistrial.' " (*Id.* at p. 607.) In this case, it is difficult to imagine the trial court could have found new counsel who could have

16

prepared for the trial quickly enough to proceed with the same jury. "A court may not automatically deny a motion for new counsel during trial no matter what the showing, but it should grant such a motion only when the defendant demonstrates that counsel is truly providing inadequate representation or that a total breakdown in the relationship has occurred that the defendant did not cause." (*Ibid*.)

We also conclude defendant has failed to demonstrate an irreconcilable conflict. The statements by both defendant and trial counsel at each hearing indicated that their disputes principally concerned tactical decisions about evidence, which would not constitute irreconcilable differences. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1207; *People v. Alfaro* (2007) 41 Cal.4th 1277, 1302; *People v. Dickey* (2005) 35 Cal.4th 884, 922; *People v. Welch* (1999) 20 Cal.4th 701, 728-729.) For instance, at the root of many of defendant's claims was his belief that the written agreement between himself and Jill provided him carte blanche for everything he did to her. However, as counsel stated, the law does not support defendant on this point. The right of unmarried persons to contract with respect to their property and financial arrangements is restricted by the fact that the contract must not be illegal or against public policy. Unmarried persons "cannot lawfully contract to pay for the performance of sexual services, for such a contract is, in essence, an agreement for prostitution and unlawful for that reason." (*Marvin v. Marvin* (1976) 18 Cal.3d 660, 674.) As repeatedly pointed out by the court in *Marvin*, a contract is unenforceable to the extent that it explicitly rests upon a consideration of meretricious sexual services. (See *id*. at pp. 669-671.) Here, the agreement explicitly and entirely rested on sexual services because it purported to provide that Jill would relinquish her sexual and financial autonomy in exchange for defendant's sexual domination. As this agreement was "inseparably based upon [the] services of a paramour," it appears

17

unenforceable.[5]  (See *Marvin*, at p. 672.)  Thus, contrary to defendant's staunchly held belief, the existence of the agreement did not provide insurmountable evidence as to his actual innocence.  At best, and as noted by the trial court during the sixth *Marsden* hearing, held on March 8, 2021, it provided insight and support for whether Jill consented to the sexual acts at issue in the case.  Also as noted by the trial court, counsel mounted a defense consistent with the law when he emphasized facts supporting defendant's claim that Jill consented and attacked Jill's credibility regarding her claims otherwise.

Nevertheless, defendant argues that when, during the fourth *Marsden* hearing, counsel agreed with defendant that there was a "total breakdown" in the attorney-client relationship, this statement was one of many indicia of a dysfunctional professional relationship.  He also claims that "[g]iven the number and magnitude of their disagreements, the court could not rationally have continued to find they had a sufficiently productive and collaborative relationship both leading up to and continuing throughout the trial."  We disagree.  While it is true that counsel and defendant were often frustrated in their attempts to communicate, it is abundantly clear that this was because defendant clung to his beliefs as to what and how evidence should be presented to the jury, and he would not heed counsel's attempts to explain a more viable defense strategy.  For example, in the fourth *Marsden* hearing, defendant explained the source of the conflict leading to his lack of confidence in counsel:  Counsel "is unable to relate what I say to the Court *as I say it.*"  (Italics added.)  "Counsel represents what he wants to tell the Court, not what I want to tell the Court.  I have a right to confront the witnesses against me.  I have a right to confront my accusers.  Counsel is confronting the accusers as he wishes with the words from his mouth, not as I wish from the words from my

---

[5]  We recognize we are not called upon to definitively decide the legitimacy of this agreement.  We cite the relevant law to provide juxtaposition between the defense defendant wanted, and the one he received.

mouth." When defendant asked to be "co-counsel," it became clear that the conflict was not pertaining to *counsel*, but counsel's refusal to act as defendant's puppet.

Defendant argues that his relationship with defense counsel "had issues involving a lack of mutual respect and trust," beginning when counsel expressed a doubt concerning defendant's mental competency. We find this statement only partially true. A review of the *Marsden* hearing transcripts does not reveal evidence of counsel's lack of respect for his client. Rather, it is clear that defendant repeatedly disrespected counsel, the court, and the prosecutor.

Indeed, it was defendant's own outbursts and inability to rationally communicate that prompted counsel's request for a section 1368 evaluation. While this resulted in friction between counsel and defendant, it resolved the question of whether an underlying mental illness prevented defendant from rationally and respectfully communicating with counsel. Counsel was frustrated in his attempts to communicate with defendant because defendant would not listen and instead would often become irate, lashing out at counsel. On one occasion, defendant's vehemence was so loud and disruptive, it interfered with other conferences taking place in different areas of the building. On that occasion, counsel left the conference shaking. Nevertheless, counsel maintained his policy of answering defendant's call at any time—even at night and during dinner—unless counsel was in court. In light of these circumstances, we find it was defendant who created and maintained any lack of respect that defendant now claims required substitution of counsel.[6] " '[A] defendant may not force the substitution of counsel by his own conduct

---

[6]    In fact, defendant failed to maintain decorum throughout trial. The record reveals instances of outbursts that included interrupting the prosecutor's closing argument to call her a liar, disobeying court orders regarding method of communication, audibly interrupting his own counsel, and even pinching counsel in view of the jury. We expect attitudes of respect and decorum from all parties, but specifically note that appointed counsel is not the modern-day helot of the judicial system, subject to defendant's physical

that manufactures a conflict.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 600, quoting *People v. Smith* (1993) 6 Cal.4th 684, 696; see also *People v. Lindsey* (1978) 84 Cal.App.3d 851, 860 [a breakdown caused by the defendant's intransigence and failure to cooperate is insufficient to support substitution of appointed counsel].)

Defendant argues that the obvious breakdown in communication led to "counsel's frequent abandonment of his role as 'captain of the ship,' " especially during cross-examination of Jill and direct examination of defendant, where he "all but turned over the questioning to his client." We disagree. The transcripts of the *Marsden* hearings are replete with examples of counsel's ship steering; counsel considered defendant's input, rejecting his inappropriate demands. Moreover, consideration of defendant's input is appropriate as it is necessarily an extension of defendant's right to be personally present at critical stages when it is either "necessary for an 'opportunity for effective cross-examination,' for purposes of the Sixth Amendment's confrontation clause (*Kentucky v. Stincer* [(1987)] 482 U.S. [730,] 744-745, fn. 17); or would have 'contribute[d]' to the trial's 'fairness' in any marginal way, for purposes of the Fourteenth Amendment's due process clause." (*People v. Waidla* (2000) 22 Cal.4th 690, 742, italics omitted.) To the extent defendant argues that this input rendered counsel's assistance ineffective, defendant has not developed that claim sufficiently to allow us to address it.

We conclude that the trial court did not abuse its discretion in denying defendant's *Marsden* motions.

Finally, defendant argues that the trial court's failure to substitute counsel in light of the total relationship breakdown resulted in the constructive denial of effective assistance of counsel and satisfies the prejudice standard under *Chapman*. Having found no error in the trial court's refusal to substitute counsel, we have no difficulty concluding

---

and verbal abuse. A defendant cannot treat counsel as such and necessarily expect to lay the blame at counsel's feet when communication is less than smooth.

defendant has not shown constructive denial of effective assistance of counsel and has not established that he was prejudiced under the *Chapman* standard. (*Chapman v. California, supra*, 386 U.S. at p. 24; *Marsden, supra*, 2 Cal.3d at p. 126.)

II

*Jury Instructions*

At trial, Jill provided evidence that defendant committed prior uncharged criminal sex offenses and domestic violence upon her. The prosecution relied on this evidence of similar yet uncharged crimes to prove defendant's propensity to commit the charged offenses. (See, e.g., Evid. Code, §§ 1108, 1109; *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159-1166 (*Villatoro*).) Defendant contends CALCRIM Nos. 1191A and 852A, concerning the jury's use of the propensity evidence admitted under Evidence Code sections 1108 and 1109, confused and misled the jury about the prosecution's obligation to prove the charged crimes beyond a reasonable doubt. We disagree.

As the People note, defendant did not object to either instruction at issue. However, asserting the issue is not forfeited, defendant contends that the issue involves a violation of his substantial constitutional rights. Considering the totality of the instructions, we conclude that the instructions complied with the law and did not violate due process. (See, e.g., *People v. Reliford* (2003) 29 Cal.4th 1007, 1013 (*Reliford*) ["we must view a challenged portion 'in the context of the instructions as a whole and the trial record' to determine ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution' "].)

Defendant's challenge to the instructions involving prior uncharged sex and domestic violence offenses (CALCRIM Nos. 1191A & 852A) is based on his assertion that the instructions lowered the reasonable doubt standard for guilt, creating structural error and requiring reversal. The California Supreme Court has rejected this argument regarding consideration of evidence of other sex crimes against a different victim. (*Reliford, supra*, 29 Cal.4th at pp. 1012-1016.) The defendant in that case argued that

21

instructing the jury with CALJIC No. 2.50.01, the predecessor to former CALCRIM

No. 1191, was " 'likely to mislead the jury concerning . . . the prosecution's burden of

proof.' " (*Reliford*, at p. 1012.)  The version of CALJIC No. 2.50.01 considered in

*Reliford* is similar in all material respects to CALCRIM No. 1191A in its explanation of

the law on permissive inferences and the burden of proof.[7]  Focusing on the plain

language of the instruction, the court in *Reliford* concluded:  "We do not find it

reasonably likely a jury could interpret the instructions to authorize conviction of the

---

[7]     The version of CALCRIM No. 1191A given to the jury in this case reads, in
pertinent part, as follows: "You may consider this evidence of uncharged sex offenses
only if the People have proved by a preponderance of the evidence that the defendant in
fact committed the uncharged offenses and also proved by a preponderance of the
evidence that the defendant did not actually and reasonably believe that the woman
consented.  Proof by a preponderance of the evidence is a different burden of proof from
proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if
you conclude that it is more likely than not that the fact is true.  [¶]  If the People have not
met this burden of proof, you must disregard this evidence entirely.  [¶]  If you decide
that the defendant committed the uncharged offenses, you may, but are not required to,
conclude from that evidence that the defendant was disposed or inclined to commit
sexual offenses, and based on that decision, also conclude that the defendant was likely to
commit the charged sex offenses:  sodomy by use of force (counts one through three) and
forced oral copulation (counts four and five).  If you conclude that the defendant
committed the uncharged offenses, that conclusion is only one factor to consider along
with all the other evidence.  It is not sufficient by itself to prove that the defendant is
guilty of the charged sexual offenses in counts one through five.  The People must still
prove each sex offense charged in counts one through five beyond a reasonable doubt."

The version of CALJIC No. 2.50.02 given to the jury in *Reliford* reads, in
pertinent part, as follows:  " 'If you find that the defendant committed a prior sexual
offense in 1991 involving S[.]B[.], you may, but are not required to, infer that the
defendant had a disposition to commit the same or similar type sexual offenses.  If you
find that the defendant had this disposition, you may, but are not required to, infer that he
was likely to commit and did commit the crime of which he is accused.  [¶]  However, if
you find by a preponderance of the evidence that the defendant committed a prior sexual
offense in 1991 involving S[.]B[.], that is not sufficient by itself to prove beyond a
reasonable doubt that he committed the charged crime.  The weight and significance of
the evidence, if any, are for you to decide.' " (*Reliford, supra*, 29 Cal.4th at p. 1012.)

22

charged offenses based on a lowered standard of proof. Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination" whether the defendant committed an uncharged sex crime. (*Reliford*, at p. 1016; see also *People v. Phea* (2018) 29 Cal.App.5th 583, 614 ["it is not reasonably likely a jury would conclude that the lower standard of proof applicable to the uncharged offenses would apply to the proof of the charged offenses"].) We are in no position to reconsider the Supreme Court's holding in *Reliford*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Defendant argues, however, that reliance on *Reliford* is inapposite because it addressed consideration of evidence of crimes against someone other than the victim. Defendant contends it is too complicated a task for a jury to distinguish between the burden of proof by a preponderance of the evidence for uncharged offenses and proof beyond a reasonable doubt for charged offenses where, as here, the evidence of charged and uncharged crimes all came from Jill's testimony.[8] We disagree.

There is nothing in *Reliford* that suggests the analysis is limited to instructions regarding uncharged crimes committed against persons other than the victim. Rather, the focus in *Reliford* was whether use of a different standard of proof for uncharged offenses negatively interfered with the People's ultimate burden of proof for the charged offenses. The existence of that problem is dependent on the instructions themselves, not the source of the evidence. Indeed, other courts faced with a single source of evidence of a defendant's charged and uncharged crimes have focused their analysis on whether the instructions correctly conveyed the law. For example, in *Gonzales, supra*, 16 Cal.App.5th 494, the prosecution presented evidence of charged and uncharged sex

---

[8]    Defendant argues we should act on the concerns stated by Justice Perren in his concurring opinion in *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*). As we discuss *post*, we find no instructional error in this case.

offenses the defendant committed through the victim's own testimony. (*Id*. at p. 496.) The defendant contended, inter alia, that CALCRIM No. 1191 "likely resulted in the jury misapplying the burden of proof for the charged offenses," based on "that portion of CALCRIM No. 1191 that instructs the jury may consider the uncharged offenses if the People have proved them by a preponderance of the evidence." (*Gonzales*, at p. 502.) The court rejected that contention, noting that "CALCRIM No. 1191 also instructs that the uncharged offenses are only one factor to consider; that they are not sufficient to prove by themselves that the defendant is guilty of the charged offenses; and that the People must still prove the charged offenses beyond a reasonable doubt." (*Ibid.*, citing *Reliford, supra*, 29 Cal.4th at pp. 1011-1016.)[9]

So, too, in this case, CALCRIM No. 1191A told the jurors that the People must prove each charge beyond a reasonable doubt. Further, the jury was instructed with CALCRIM No. 220 (Reasonable Doubt), and, in closing argument, the prosecutor emphasized that if the evidence of other crimes were proven by a preponderance of the evidence, that other evidence was one factor that the jury could—but was not required to—consider when determining the People's ultimate burden to prove the charges beyond a reasonable doubt.

The decisions in *Villatoro, supra*, 54 Cal.4th 1152 and *People v. Cruz* (2016) 2 Cal.App.5th 1178, cited by defendant, do not support his claims. Citing to *Villatoro*, defendant argues that the California Supreme Court has " 'strongly implied' that a jury

---

[9]     The *Gonzales* court also noted that the defendant's theory that testimony about a defendant's uncharged sexual misconduct that comes from the victim herself "adds nothing to her credibility" (*Gonzales, supra*, 16 Cal.App.5th at p. 501), actually relates to the admissibility of the victim's evidence of uncharged misconduct, not the instruction. The defendant did not challenge the trial court's ruling admitting the evidence for the purpose stated in CALCRIM No. 1191, and the court addressed the issue as instructional error, concluding that "[g]iven that the evidence is admissible for such purpose, CALCRIM No. 1191 correctly instructs the jury." (*Gonzales*, at p. 501.)

24

could not reliably apply two different standards of proof when the propensity evidence consisted of charged rather than uncharged offenses." (Fn. omitted.) In that case, the court rejected the argument that CALCRIM former No. 1191 impermissibly lowered the standard of proof or otherwise interfered with the defendant's presumption of innocence when "the instruction clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity." (*Villatoro*, at p. 1168.)

*Cruz* held that CALJIC No. 2.50.01, which did not distinguish between charged and uncharged sex offenses, was incorrect in stating that a charged offense found true only by a preponderance of evidence could be used to show propensity to commit other offenses. (*People v. Cruz, supra*, 2 Cal.App.5th at pp. 1183-1184.) The court concluded that lay jurors could not reasonably be expected to find charged offenses true by a preponderance of evidence to show propensity and then decide that the same offenses were proven beyond a reasonable doubt. (*Id.* at p. 1186.) The court held the instruction must specify "that a currently charged offense must be proved beyond a reasonable doubt before it can be used as propensity evidence in support of another currently charged offense." (*Ibid.*)[10]

Contrary to defendant's claim, the *Villatoro* court did not imply the jury could not handle two different standards; the court simply determined there was no risk the jury would apply an impermissibly low standard of proof when it was solely and consistently instructed on proof beyond a reasonable doubt. (*Villatoro, supra,* 54 Cal.4th at p. 1168.) Nor is the instant case like *Cruz* because here, the jury was properly instructed on the

---

[10] Following *Villatoro* and *Cruz*, CALCRIM No. 1191 was divided into CALCRIM No. 1191A for uncharged offenses, the instruction given here, and CALCRIM No. 1191B for charged offenses to expressly incorporate the differing standards of proof. (See *Gonzales, supra*, 16 Cal.App.5th at p. 496, fn. 1; *People v. Jones* (2018) 28 Cal.App.5th 316, 327, fn. 8.)

25

burden of proof that must be met before the jury may (but is not required to) consider evidence of uncharged offenses as one factor in deciding whether the People proved beyond a reasonable doubt that defendant committed the charged offenses.

Applying defendant's argument to CALCRIM No. 852A regarding evidence of uncharged domestic violence, this court has previously explained that Evidence Code sections 1108, allowing admission of evidence of uncharged sexual offenses, and 1109, allowing admission of evidence of uncharged domestic violence, are "virtually identical." (*People v. Johnson* (2000) 77 Cal.App.4th 410, 417.) Likewise, the language of CALCRIM No. 1191A, the current instruction on Evidence Code section 1108, tracks the language of CALCRIM No. 852A, the current instruction on Evidence Code section 1109. (See *People v. Johnson* (2008) 164 Cal.App.4th 731, 739.) By analogy to *Reliford*, we reject defendant's argument regarding the jury instruction on use of his prior domestic violence offenses. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 378; *People v. Reyes* (2008) 160 Cal.App.4th 246, 253.)

In short, we perceive no violation of due process or prejudice from the instructions regarding the prosecution's use of Jill's testimony of defendant's uncharged sexual and domestic violence offenses in determining the ultimate question of defendant's guilt.

III

*Cruel and Unusual*

As noted, defendant was sentenced to an aggregate term of 280 years to life, including eight consecutive 25-year-to-life third strike terms (§ 667, subd. (e)(2)(A)(ii)) for an indeterminate sentence of 200 years to life, and two "nickel priors" (i.e., five-year enhancements under § 667, subd. (a)) for each of those eight counts, for a determinate sentence of 80 years. Defendant does not contest his status as a third strike offender or argue that he was not subject to the sentencing enhancements. Instead, he argues the imposition of this sentence constitutes cruel and/or unusual punishment within the meaning of the federal and state Constitutions because it cannot possibly be completed in

his lifetime. He also contends his sentence violates due process because it constitutes a de facto life without the possibility of parole sentence without special circumstances findings required for other life without the possibility of parole sentences under section 190.2. We disagree.

We note first that defendant acknowledges his attorney did not raise this issue in the trial court, and he thus arguably waived the issue on appeal. "Nonetheless, we shall reach the merits under the relevant constitutional standards, in the interest of judicial economy to prevent the inevitable ineffectiveness-of-counsel claim." (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.)

On the merits, defendant supports his argument by citing two statements from the late Justice Mosk. The first appears in a dissenting opinion in *People v. Hicks* (1993) 6 Cal.4th 784, 797: "A sentence . . . that cannot possibly be completed in the defendant's lifetime, makes a mockery of the law and amounts to cruel or unusual punishment." Dissenting opinions, of course, are not binding and have " 'no function except to express the private view of the dissenter.' " (*Glover v. Board of Retirement* (1989) 214 Cal.App.3d 1327, 1337.)

The second statement appears in a concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, 600-601: "A sentence of 111 years in prison is impossible for a human being to serve, and therefore violates both the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution and the cruel or unusual punishment clause of article I, section 17 of the California Constitution." As we have previously noted about this particular concurring opinion, " 'no opinion has value as precedent on points as to which there is no agreement of a majority of the court. [Citations.]' [Citations.] Because no other justice on our Supreme Court joined in Justice Mosk's concurring opinion, it has no precedential value." (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383.) In addition to having no precedential value, we went on to explain that "we respectfully disagree with Justice Mosk's analysis. In our view, it is

27

immaterial that defendant cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution." (*Ibid*.) We find the instant case is an appropriate case in which to impose such a sentence and, as discussed below, is not unconstitutionally disproportionate to the crimes.

"The Eighth Amendment contains a ' "narrow proportionality principle" that "applies to noncapital sentences." ' [Citation.] The Eighth Amendment 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' [Citation.] Reviewing courts must ' "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." ' [Citations.] This is especially so in assessing the proportionality of a sentence of imprisonment, where 'the relative lack of objective standards concerning terms of imprisonment' means that successful challenges are ' " 'exceedingly rare.' " ' [Citations.]" (*People v. Edwards* (2019) 34 Cal.App.5th 183, 190-191.) The California Constitution similarly forbids only sentences that are so " ' "grossly disproportionate to the defendant's culpability" ' " that they " 'shock[] the conscience and offend[] fundamental notions of human dignity.' " (*Edwards*, at p. 191.) Defendant fails to convince us that his sentence is so grossly disproportionate to his culpability that it violates either the federal or state Constitutions.

Defendant was convicted of three counts of forcible sodomy and two counts of forcible oral copulation. The Legislature has defined both crimes as " 'violent' " felonies and has declared they "merit special consideration when imposing a sentence to display society's condemnation for these extraordinary crimes of violence against the person." (§ 667.5, subd. (c).) The United States Supreme Court has upheld sentences of life

28

without the possibility of parole for nonviolent crimes, and "[s]ince a sentence of life without parole is not cruel and unusual for certain nonviolent offenses, then, a fortiori, a sentence of [life without parole] is not cruel and unusual for" violent crimes. (*People v. Norman, supra*, 109 Cal.App.4th at p. 230; see also *Harmelin v. Michigan* (1991) 501 U.S. 957 [upholding sentence of life without possibility of parole for possession of 672 grams of cocaine].) Here, defendant was convicted of not one but *five* violent sex crimes. This fact alone convinces us his sentence is not cruel and/or unusual. But that is not all. Defendant was also convicted of three crimes defined as " 'serious' " felonies—criminal threats, attempting to dissuade a victim or witness, and burglary. (§ 1192.7, subd. (c).) And, critically, defendant had two prior serious felony convictions for assault with a deadly weapon or likely to result in great bodily injury, and that fact is primarily responsible for the length of his current sentence because section 667 requires trial courts to impose longer sentences on defendants who have previously committed serious felonies. (§ 667, subds. (a), (e)(2).)

Statutes like section 667 that impose more severe punishments on repeat offenders "have long withstood constitutional challenge." (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1137.) Almost a century ago, our Supreme Court made these observations when upholding a precursor to section 667: "Can it be said that a statute or a section of the code prescribing a punishment of life imprisonment, without the right of parole, for those found guilty of the commission of a felony, after they have been three times previously convicted of a felony, is so disproportionate to the offense for which it is inflicted that it shocks the moral sense of the people? We think not." (*In re Rosencrantz* (1928) 205 Cal. 534, 539.) "[T]hese observations . . . must be deemed equally, or more, applicable today." (*People v. Weaver* (1984) 161 Cal.App.3d 119, 125.) Here, defendant was convicted of five violent sex crimes and three serious felonies, and he had two prior serious felony convictions. Numerous cases have upheld de facto sentences of life without possibility of parole in similar circumstances. (See *People v. Retanan* (2007)

154 Cal.App.4th 1219, 1230-1231 [upholding sentence of 135 years to life for numerous sex offenses against young girls]; *People v. Byrd, supra*, 89 Cal.App.4th at p. 1382 [upholding sentence of 444 years to life plus 115 years for third striker who committed 12 armed robberies]; *People v. Cartwright, supra*, 39 Cal.App.4th at pp. 1136-1137 [upholding sentence of 375 years to life plus 53 years for third striker convicted of multiple counts of assault with a deadly weapon, forcible oral copulation, and rape].)

In an attempt to distinguish his case from the above analysis, defendant argues his sentence is grossly disproportionate to his culpability because, in California, a sentence of life without the possibility of parole may only be imposed for first degree murder where the jury finds one or more special circumstances exist. To the extent his point is that murder is more serious than any of the crimes for which he was convicted, and it is thus cruel and/or unusual to punish him as severely as a murderer, we considered, and rejected, a similar argument in *People v. Cartwright, supra*, 39 Cal.App.4th at pages 1136 to 1137. In *Cartwright*, we used language that is as applicable here as it was in that case: "Defendant's comparison of his punishment to that of a murderer is misguided. He ignores that the three strikes law punishes not only his current offenses, but also his recidivism." (*Id.* at p. 1136.) So, too, in this case. Defendant's sentence reflects the fact that he was convicted of three counts of forcible sodomy, and two counts of forcible oral copulation, and one count of making criminal threats, and one count of attempting to dissuade a witness, and one count of burglary, and he had one prior conviction for assault with a deadly weapon or likely to result in great bodily injury with a finding of great bodily injury and use of a weapon, and a second prior conviction for assault with a deadly weapon. In these circumstances, a sentence of life without the possibility of parole is not so grossly disproportionate to his culpability that it violates the federal or state constitutional prohibitions against cruel and/or unusual punishment.

Finally, defendant contends that the sentence violates due process because his de facto sentence of life without the possibility of parole was imposed through an "end run

around the procedural and substantive requirements of section 190.2" and should be vacated. But the Legislature never expressed its intention that only under such circumstances could a sentence of life without the possibility of parole be applied. Indeed, the Legislature has enacted other sentencing schemes, such as the three strikes law, which provide for multiple lengthy consecutive terms that also may result in a de facto sentence of life without the possibility of parole. (§ 667, subds. (c)(6), (7), (e); *People v. Deloza, supra*, 18 Cal.4th at pp. 589-600 [affirming a sentence of 11 years plus four consecutive terms of 25 years to life for four counts of armed robbery against four victims in a single incident].) Accordingly, we reject defendant's due process claim.

We conclude defendant's sentence is not unconstitutional.

IV

*Credits*

During the sentencing hearing, the trial court noted that defendant was in custody from June 14, 2020, to the date of sentencing, September 21, 2021, but did not award presentencing custody or worktime credits. The parties agree that the trial court erred in relying on section 1170.12, subdivision (a)(5), which operates to restrict the credit rights of some offenders, to withhold awarding these credits.

The California Supreme Court has held: "[R]estrictions on the rights of Three Strikes prisoners to earn term-shortening credits do not apply to confinement in a local facility prior to sentencing. We emphasized that when limiting the credit rights of offenders sentenced thereunder, the Three Strikes law (§§ 667, subd. (c)(5), 1170.12, subd. (a)(5)) expressly refers only to '*post*sentence . . . credits,' i.e., those ' "awarded pursuant to [a]rticle 2.5" ' (*People v. Thomas* (1999) 21 Cal.4th 1122, 1125, italics in original), and 'does not address *presentence* . . . credits' for Three Strikes defendants (*ibid*., italics added)." (*People v. Buckhalter* (2001) 26 Cal.4th 20, 32.)

We agree with the parties that defendant's presentence custody credits should have been calculated according to section 4019, and his worktime credits calculated according

31

to section 2933.1, which applies to offenders convicted of violent crimes.  (See *People v. Jones* (2023) 88 Cal.App.5th 818, 823 [modifying credits pursuant to § 4019]; § 2933.1, subd. (c) [a defendant who is convicted of a violent crime as defined in § 667.5, subd. (c) including violating §§ 286, subd. (c) or (d), 287, subd. (c) or (d) is only entitled to 15 percent worktime credit].)  We modify the judgment to reflect the award of actual custody credits in the amount of 465 days and 69 days of worktime credit for a total of 534 days of presentence custody credits.

## DISPOSITION

The judgment is modified to award 465 days of actual credit and 69 days of worktime credit for a total of 534 days.  The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy of it to the parties and the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.


_____/s/_____<br>
EARL, P. J.

We concur:


_____/s/_____<br>
HULL, J.


_____/s/_____<br>
MESIWALA, J.


32
